UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 2, 2015
```

------------------------------------------------------X
                                   :

JORGE A. MARTINEZ, JR.,           :
                                     :

                   Plaintiff,    :        13 Civ. 7254 (KPF)
                                     :

                v.               :        OPINION AND ORDER
                                     :

CAROLYN W. COLVIN, Acting      :
Commissioner of Social Security,     :
                                     :

                  Defendant.  :
                                     :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Jorge Martinez filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Acting Commissioner of Social Security (the "Commissioner"), partially denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") based on a finding that Plaintiff was not disabled under the Social Security Act (the "Act") until January 15, 2012.  The parties have cross-moved for judgment on the pleadings.  While the Commissioner's determination of Plaintiff's residual functional capacity is supported by substantial evidence, the Administrative Law Judge (the "ALJ") improperly failed to consult a vocational expert in determining that jobs existed in significant numbers in the national economy that Plaintiff could perform.  Accordingly, the Commissioner's motion is denied, and Plaintiff's motion is granted to the extent it seeks a remand for the limited purpose of consultation of vocational expert testimony.

## BACKGROUND[1]

### A.     Plaintiff's Ailments

Plaintiff, who was born on January 16, 1962, applied for DIB and SSI on June 24, 2010.  (SSA Rec. 34, 255).  On these applications, Plaintiff alleged disability beginning January 1, 2005 (*id.* at 243, 267), though at a hearing before ALJ Seth Grossman, Plaintiff's counsel amended that date to December 31, 2008 (*id.* at 123).  Plaintiff, who has not worked since 2005, alleges that he is disabled due to a variety of physical ailments, including diabetes, high blood pressure, liver disease, kidney disease, pancreas disease, pain in his left knee and shoulder, arthritis, hepatitis C, high cholesterol, and various infections throughout his body at different times, possibly caused in whole or in part by his other conditions.  (*Id.* at 83-84, 272, 278).  Plaintiff also alleges that his mental health issues contribute to his disability.

### B.     Plaintiff's Treatment History

#### 1.     Treatment for Knee and Shoulder Issues

Prior to April 2010, Plaintiff appears to have used a cane but was otherwise independent in his daily activities.  (SSA Rec. 391).  However, the nearly illegible notes of Dr. Gaetano Perilli, Plaintiff's primary care physician, appear to reflect complaints of musculoskeletal pain and prescriptions for Vicodin from January to September of 2009.  (See *id.* at 725-36).  And on

---

[1]     The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #21) filed by the Commissioner as part of her Answer.  For convenience, the Commissioner's memorandum in support of her motion for judgment on the pleadings (Dkt. #25) is referred to as "Def. Br."; Plaintiff's supporting memorandum (Dkt. #27) as "Pl. Br."; and the Commissioner's reply brief in opposition to Plaintiff's motion (Dkt. #28) as "Pl. Reply."

March 31, 2010, Dr. Perilli indicated that Plaintiff was unable to work due to chronic back pain and "other ailments." (*Id.* at 337).

In April 2010, Plaintiff was hospitalized at Montefiore Medical Center ("Montefiore") for a methicillin-resistant staphylococcus aureus ("MRSA") bacterial infection, which caused abscesses in multiple places on Plaintiff's body, including his left knee. (SSA Rec. 340-419). The hospitalization progress notes indicated that Plaintiff suffered from arthritis, inflammation, and a septic infection in his left knee, in addition to diabetes and hypertension. (*Id.* at 341, 373-74). After being discharged from Montefiore, Plaintiff was transferred to Beth Abrams Health Services ("Beth Abrams") for a rehabilitation program, where he received further treatment for an abscess on his left buttock. (*Id.* at 420-580, 430-31). An April 23, 2010 x-ray of Plaintiff's left knee taken at Beth Abrams revealed mild degenerative disease and no fracture, dislocation, or destructive lesions. (*Id.* at 555). Two x-rays of Plaintiff's shoulder in May and June of that same year revealed mild degenerative joint disease and osteoporosis. (*Id.* at 553-54).

Plaintiff was referred by Beth Abrams to an orthopedic surgeon, Dr. David Gonzalez, for an appointment on June 9, 2010. (SSA Rec. 886). Dr. Gonzalez related in his notes that Plaintiff had complained of "years of shoulder and knee pain," but that the knee pain was "getting better with physical therapy." (*Id.*). Examining Plaintiff's left shoulder, Dr. Gonzalez found

3

impingement sign, Hawkins sign,[2] and pain when testing Plaintiff's rotator cuff strength; he suggested a cortisone injection once Plaintiff was finished with the antibiotics protocol from his MRSA infection, and prescribed physical therapy in the meantime. (*Id.*). At a follow-up appointment on June 15, 2010, Dr. Gonzalez indicated that Plaintiff no longer had knee pain, but continued to have shoulder pain. (*Id.* at 417). The doctor again found impingement sign, Hawkins sign, and pain on rotator cuff testing, as well as limited range of motion in both rotation and elevation. (*Id.*). He diagnosed Plaintiff with rotator cuff symptoms and early adhesive capsulitis. (*Id.*).[3] With Plaintiff's course of antibiotics completed, Dr. Gonzalez administered a cortisone injection, which provided immediate relief, and prescribed physical therapy. (*Id.*). He then completed a form that indicated that Plaintiff's shoulder problems did not allow him to return to work. (*Id.* at 338). On August 20, 2010, Dr. Gonzalez once again diagnosed Plaintiff with adhesive capsulitis and prescribed physical therapy for his left knee and shoulder. (*Id.* at 664).

---

[2]   Hawkins sign is a diagnostic technique used to identify subacromial bursitis (inflammation of the bursa beneath the acromion, a bony process on the rear of the shoulder), impingement (inflammation of the tendons within the rotator cuff), and partial or complete rotator cuff tears. Peter B. MacDonald, Peter Clark, and Kelly Sutherland, *An Analysis of the Diagnostic Accuracy of the Hawkins and Neer Subacromial Impingement Signs*, 9 J. Shoulder & Elbow Surgery, no. 4, 2000 at 299, 299.

[3]   Adhesive capsulitis (also known as "frozen shoulder"), which can be associated with diabetes, is characterized by pain and reduced range of motion in the shoulder due to inflammation. Frozen Shoulder, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000455.htm (last visited July 2, 2015).

On September 13, 2010, Dr. Dipti Joshi examined Plaintiff at the Commissioner's request.  (SSA Rec. 586).  Dr. Joshi observed "no acute distress" relating to Plaintiff's movements and gait: Plaintiff was able to "walk on heels and toes without difficulty" and squat "to about 25% of full."  (*Id.* at 587).  Although Plaintiff used a cane, he was able to get on and off the exam table, dress and undress himself, and rise from a chair without difficulty.  (*Id.*).  Dr. Joshi observed limited range of motion and tenderness in Plaintiff's left shoulder, and "severe left knee tenderness" causing limited range of motion in his left hip.  (*Id.* at 588).  He found that Plaintiff had full strength, both generally and in his grip, along with full dexterity of his hands and fingers.  (*Id.* at 588-89).  Dr. Joshi diagnosed Plaintiff with, in addition to his internal ailments, arthritis in his left knee and left shoulder, and recommended that Plaintiff "avoid strenuous exertion involving heavy lifting, carrying, pushing, and pulling, prolonged walking, climbing, standing, and squatting."  (*Id.* at 589).  He also noted Plaintiff's "moderate limitation to reaching with his left shoulder."  (*Id.*).

On November 19, 2010, Plaintiff returned to Dr. Gonzalez for a follow-up evaluation of his left shoulder and left knee.  (SSA Rec. 884).  Plaintiff reported that he had been "doing great" after his June 15 cortisone injection, but that subsequent physical therapy (and "some sort of other injection") had led to a return of pain.  (*Id.*).  Upon examining him, Dr. Gonzalez found impingement and Hawkins sign in his shoulder, along with pain on testing, but improved motion and rotator cuff strength.  (*Id.*).  He also found tenderness in Plaintiff's

left knee, but no instability.  (*Id.*).  Dr. Gonzalez diagnosed Plaintiff with rotator

cuff disease in his left shoulder and osteoarthritis in his left knee, and

administered cortisone injections to his shoulder and knee.  (*Id.*).

On December 8, 2010, Dr. Gonzalez filled out a Medical Source

Statement questionnaire indicating that Plaintiff could never lift or carry ten

pounds; that he could spend a maximum of four hours sitting, three hours

standing, and one hour walking in an eight-hour workday; that he could

occasionally use his right hand to reach up or out, handle, finger, feel, push, or

pull; that he could occasionally use his left hand to handle, finger, or feel; that

he could never use his left hand to reach up or out, to push, or to pull; that he

could frequently use his right foot and occasionally his left foot to operate foot

controls; that he could occasionally climb stairs and ramps or balance; and

that he could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl.

(SSA Rec. 680-81).  He further indicated that Plaintiff could occasionally

tolerate humidity, wetness, dust, odors, fumes, and vibrations, and that he

could never tolerate unprotected heights, moving mechanical parts, or extreme

heat or cold.  (*Id.* at 682).  Dr. Gonzalez additionally concluded that Plaintiff

could never use standard public transportation, nor could he sort, handle, or

use paper or files.  (*Id.* at 683).

On October 3, 2011, Plaintiff was examined by Dr. Jose Corvalan, an

orthopedist, at the Commissioner's request.  (SSA Rec. 864-68).  On evaluation,

Plaintiff appeared to be in no acute distress, though his gait revealed a limp

favoring his left knee.  (*Id.* at 866).  Dr. Corvalan noted Plaintiff's use of a cane

and stated that he could not walk more than ten feet without it, walk on heels and toes, or squat. (*Id.*). Plaintiff's pain and instability increased without the cane, and Dr. Corvalan observed that Plaintiff needed some help getting off the exam table and was able to rise from a chair with some difficulty. (*Id.*). Plaintiff had full range of motion and strength in his right shoulder, and limited range of motion and 4/5 strength in his left shoulder. (*Id.*). Plaintiff had full grip strength and full range of motion and dexterity in both hands, wrists, and elbows. (*Id.*). Dr. Corvalan similarly observed limited range of motion in Plaintiff's left leg and pain in his left knee. (*Id.* at 867). He concluded that Plaintiff had moderate limitations for reaching and lifting due to pain in his left shoulder, and moderate limitations for sitting, standing, walking long distances, bending, squatting, climbing stairs, and lifting heavy objects due to pain in his left knee. (*Id.*).

On October 7, 2011, Dr. Corvalan completed the same Medical Source Statement questionnaire that had been given to Dr. Gonzalez. (SSA Rec. 869-74). He determined that Plaintiff could conduct not a single one of the physical actions identified in the questionnaire in either his right or left hand or foot. (*Id.*). Instead, Dr. Corvalan stated that Plaintiff could — at most — sit, stand, or walk for thirty minutes each either continuously or total in an eight-hour workday; that he could walk no more than twenty feet without a cane; and that he could never tolerate any of the environmental conditions identified in the questionnaire. (*Id.*). Dr. Corvalan additionally indicated that Plaintiff could not ambulate without using a wheelchair, walker, two canes, or

7

two crutches; walk a block at a reasonable pace on an uneven surface; or climb a few steps at a reasonable pace while using a single handrail, though he could use standard public transportation.  (*Id.* at 874).

On October 14, 2011, Dr. Gonzalez diagnosed Plaintiff with a full-thickness tear in his left rotator cuff based upon a magnetic resonance imaging ("MRI") test.  (SSA Rec. 891).  Dr. Gonzalez recommended surgery, to which Plaintiff agreed.  (*Id.*).  On November 3, 2011, Dr. Gonzalez performed the surgery.  (*Id.* at 882).  Plaintiff reported feeling great with no pain six days after the surgery (*id.* at 889), though on November 30, 2011, he reported concern that he may have reinjured his shoulder when reaching out to prevent a child from falling (*id.* at 887).  Dr. Gonzalez identified clicking and slight crepitus, but stated that it was too soon to tell if Plaintiff had re-torn his rotator cuff. (*Id.*).[4]

At the supplemental hearing on February 21, 2012, ALJ Grossman obtained by telephone the testimony of Dr. Donald Goldman, an orthopedic specialist, who had not examined Plaintiff in person but had reviewed Plaintiff's medical records.  (SSA Rec. 117-39).  Dr. Goldman testified that, based upon the limited diagnostic evidence in the record regarding Plaintiff's left knee, "he should be able to walk."  (*Id.* at 130-32).  He opined that Plaintiff could do sedentary work, so long as it primarily involved the use of his right arm and did

---

[4]     Crepitus is the occurrence of air beneath the skin, which can cause a crackling sensation.  Subcutaneous Emphysema, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003286.htm (last visited July 2, 2015).

not require him to raise his left arm above shoulder level.  (*Id.* at 132-24).  Dr. Goldman testified that Plaintiff could left up to 25 pounds with both arms so long as it only involved bending of his left elbow rather than use of the shoulder, and that he could use his right arm without restriction.  (*Id.*).

### 2.   Treatment for Hepatitis C, Diabetes, Liver Disease, and High Blood Pressure

Plaintiff was diagnosed with chronic hepatitis C, grade two, stage three,[5] based upon a test performed on August 28, 2008.  (SSA Rec. 331).  On January 20, 2009, Plaintiff's primary care physician, Dr. Perilli, indicated that he would be unable to work for at least twelve months due to hepatitis C, cirrhosis of the liver, and another illegible condition.  (*Id.* at 792).  Dr. Scott Sachin, to whom Plaintiff was referred by Dr. Perilli, noted on January 25, 2009, that Plaintiff would have to refrain from consuming alcohol for one year before Dr. Sachin would begin treating his hepatitis C.  (*Id.* at 786).  The record reflects no other evaluation of or treatment for Plaintiff's hepatitis C.

Multiple portions of the record reference past diagnoses of diabetes and hypertension (*see* SSA Rec. 341, 586, 638), though the extent to which Plaintiff has sought or received treatment for these conditions is unclear.  Plaintiff testified at his supplemental hearing that he took two medications for diabetes (*id.* at 112), and Dr. Howard Tedoff noted in his October 3, 2011 psychiatric

---

[5]     In evaluating the progression of a hepatitis C patient, biopsy samples generally "are graded on a scale of 0-4, signifying the degree of necrosis and inflammation, and staged on a similar scale, signifying the degree of fibrosis or scarring."  Peter M. Rosenberg, *Hepatitis C: A Hepatologist's Approach to an Infectious Disease*, 33 Clinical Infectious Diseases, no. 10, 2001, at 1728, 1728.

evaluation of Plaintiff that he was taking Metformin, a medication for type-2 diabetes (*id.* at 878).

During Plaintiff's September 13, 2010 examination by Dr. Joshi, his blood pressure was measured at 130/90, for which Dr. Joshi advised him to seek evaluation and treatment.  (SSA Rec. 587).  After his visit with Dr. Corvalan on October 3, 2011, at which Plaintiff's blood pressure was measured at 150/110, Plaintiff signed a form stating that he had been advised to seek immediate medical attention due to his elevated blood pressure.  (SSA Rec. 875-76).  Although the record does not reflect Plaintiff seeking such treatment, he stated at the February 21, 2012 hearing that he had obtained medication from his physician (presumably Dr. Perilli).  (*Id.* at 112).  In addition, Dr. Tedoff noted in his October 3, 2011 evaluation that Plaintiff was taking Norvasc, a drug used to treat high blood pressure.  (*Id.* at 878).

### 3.      Mental Health Diagnoses and Treatment

On November 15, 2010, Plaintiff began seeing Dr. Parves Sharma for mental health treatment, complaining of depression and anger.  (SSA Rec. 687).  Plaintiff denied any substance abuse, and indicated one prior episode of psychiatric treatment for major depression.  (*Id.* at 688).  Dr. Sharma evaluated Plaintiff's attitude as cooperative; his affect as constricted; his mood as depressed; his speech and comprehension as coherent and appropriate; his psychomotor activity as normal; his thought process and content as intact without hallucinations; his self-perception as unimpaired; his attention as alert; his mental orientation normal as to time, place, and person,

10

his memory as intact, his concentration and ability to perform serial sevens as intact;[6] his judgment as intact; and his insight and impulse control as minimally impaired.  (*Id.* at 689-90).  Dr. Sharma rated Plaintiff's global assessment of functioning ("GAF") at 45,[7] and diagnosed him as having with symptoms of depression and low self-esteem; the doctor prescribed Lexapro, an antidepressant, and Ambien, a sleep medication, and recommended psychotherapy.  (*Id.* at 691).

On December 3, 2010, Plaintiff returned to Dr. Sharma for a follow-up. (SSA Rec. 692).  Plaintiff reported feeling "a little better," but said he was still depressed.  (*Id.*).  Dr. Sharma filled out a Medical Source Statement indicating that Plaintiff was moderately impaired in understanding and remembering simple instructions, and markedly impaired in carrying out such instructions; making judgments on simple work-related decisions; understanding, remembering, and carrying out complex instructions, and making judgments on complex work-related decisions.  (*Id.* at 698).  Dr. Sharma additionally indicated that Plaintiff had moderate impairment in interacting appropriately with the public and with supervisors, and marked impairment in interacting appropriately with coworkers and responding appropriately to usual work situations and to changes in a routine work setting.  (*Id.* at 699).  In

---

[6]    "Serial sevens" is a clinical test of mental function in which a patient is asked to count down from 100 by subtracting by 7.  *See generally* Craig C. Young et al., *Serial Sevens: Not the Most Effective Test of Mental Status in High School Athletes*, 7 Clinical J. Sports Med., No. 3, 1997.

[7]    The GAF is a scale of overall functioning from 1-100, on which 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. rev. 2000).

11

subsequent follow-up appointments over the next several months, Plaintiff
reported improvements in his mood, but continued to struggle with anger,
anxiety, and inability to sleep.  (*Id.* at 692-95).

On October 3, 2011, at the Commissioner's request, Plaintiff was
evaluated by Dr. Howard Tedoff.  (SSA Rec. 877-80).  Dr. Tedoff noted that
Plaintiff was on a number of psychiatric medications, including Metformin (a
diabetes medication), Lexapro (an antidepressant), Seroquel (used to treat
schizophrenia, bipolar disorder, and depression), Hydrocodone (a cough
medication), Clonazepam (used to treat panic disorder and anxiety), Risperidol
(used to treat symptoms of bipolar disorder), and Norvasc (used to treat high
blood pressure).  (*Id.* at 878).  Plaintiff reported to Tedoff that he drank beer
"constantly."  (*Id.*).[8]  On evaluation, Plaintiff was cooperative in demeanor and
responsive to questions, and adequate in his manner of relating, social skills,
and overall presentation.  (*Id.*).  Plaintiff's conversation was interactive,
relevant, and fairly intelligible, though he spoke in a monotone and sometimes
mumbled.  (*Id.* at 879).  Plaintiff was coherent in thought process, and his
affect was dysthymic (depressed) but appropriate in speech and thought
content.  (*Id.*).  Plaintiff's attention, concentration, and recent memory were
mildly impaired; he had difficulty with simple arithmetic, could not perform
serial sevens, and could remember only four digits forward and two in reverse
order.  (*Id.*).  His insight and judgment were fair, and his cognitive functioning

---

[8]     Notably, Plaintiff told Dr. Corvalan at his orthopedic examination the same day that he
        had not consumed beer since 2009 (SSA Rec. 865), and told ALJ Grossman at his
        August 12, 2011 hearing that he stopped drinking alcohol five years earlier (*id.* at 87).

was estimated to be below average.  (*Id.*).  Plaintiff's poor fund of information
was evidenced by his inability to recall the mayor of New York City.  (*Id.*).  Dr.
Tedoff concluded that Plaintiff could follow simple instructions and perform
simple tasks, but that his attention, concentration, and decision-making skills
were lacking or questionable.  (*Id.* at 879-80).  Dr. Tedoff questioned whether
Plaintiff could handle ordinary workplace stress or relate adequately with
others.  (*Id.* at 880).  Accordingly, Dr. Tedoff was "guarded" about Plaintiff's
ability to find gainful employment, and believed he would be unable to
maintain a full-time work schedule.  (*Id.*).

On January 13, 2012, Dr. Sharma filled out an assessment for Plaintiff's
claim for Social Security benefits.  (SSA Rec. 897-902).  Dr. Sharma rated
Plaintiff's GAF at 48, and assessed his ability to perform in a social or work
environment as either fair or poor/none in all areas.  (*Id.* at 899-901).

### 4.    Other Medical Treatment

On September 2, 2010, Plaintiff was admitted to Weiler Hospital
(affiliated with Montefiore) for an enlarged and tender right testicle.  (SSA
Rec. 594).  Plaintiff was diagnosed with severe epididymitis and orchitis,[9]
causing necrosis and infarction (tissue death due to inadequate blood flow) of

---

[9]    Epididymitis is an inflammation of the epididymis (the tube connecting the testicle to
the vas deferens) due to an infection.  Epididymitis, National Institutes of Health, U.S.
National Library of Medicine, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/001279.htm (last visited July 2,
2015).  Orchitis is an inflammation of one or both testicles.  Orchitis, National
Institutes of Health, U.S. National Library of Medicine, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/001280.htm (last visited July 2,
2015).

the right testicle.  (*Id.* at 618, 621).  On September 6, 2010, Dr. Howard Kivell surgically removed Plaintiff's right testicle.  (*Id.* at 618-19).

From November 4 to November 6, Plaintiff was admitted to Montefiore and treated for facial cellulitis.  (SSA Rec. 676-77).  Plaintiff has also had all of his teeth removed in a series of surgeries.  Plaintiff stated that he had all of his upper teeth removed "a long time ago" (*id.* at 115); by 2006, Plaintiff had only four teeth remaining, which four were surgically removed to treat an infection in his jaw during a stay at an Orlando hospital from November 13 to 16, 2006 (*id.* at 638-50).  Plaintiff has dentures, though he dislikes using them due to poor fit.  (*Id.* at 84).

## C.    Social Security Administration Proceedings

Plaintiff filed applications for SSI and DIB on June 24, 2010.  (SSA Rec. 34).  The SSA denied the application on October 14, 2010 (*id.* at 151-57), and Plaintiff requested a hearing before an ALJ (*id.* at 158-62).  The initial hearing took place on August 19, 2011 (*id.* at 55-98), and a supplemental hearing took place on February 21, 2012 (*id.* at 99-148).  On March 2, 2012, ALJ Grossman issued a partially favorable decision that Plaintiff was only disabled as of January 15, 2012.  (*Id.* at 30-54).  The SSA Appeals Council denied Plaintiff's request for review on August 7, 2013, and denied his request to reopen the decision on October 31, 2013.  (*Id.* at 2-6, 16-19).

### 1.    Plaintiff's August 2, 2010 Questionnaire

Prior to his claimed inability to work, Plaintiff had worked most recently in maintenance in 2004, and prior to that as a truck driver and a construction

14

supervisor.  (SSA Rec. 293).  On August 2, 2010, Plaintiff completed a questionnaire as part of his application for benefits.  (*Id.* at 283-92).  Plaintiff indicated that he was able to dress, bathe, and groom himself, and generally take care of his personal needs, though he needed to be reminded to take his medications.  (*Id.* at 284-85).  Plaintiff indicated that, aside from the occasional sandwich or bowl of cereal, his mother prepared all of his food for him because he could not handle heat or stand for long periods of time.  (*Id.* at 285).  Plaintiff stated that because of his physical weakness and left knee problems he did not do housework and rarely went outside, and did not drive due to his diabetes and high blood pressure.  (*Id.* at 285-86).  Plaintiff spent most of his time watching television.  (*Id.* at 287).

Plaintiff indicated that he could not lift, climb stairs, kneel, or squat, and that he could stand, walk, sit, reach, and use his hands only to a limited degree.  (SSA Rec. 288).  Plaintiff specified that he could walk two to three blocks using a cane or walker.  (*Id.* at 289).  He further stated that he sometimes had problems paying attention and finishing tasks, but that he could follow written and spoken instructions, and had no problems getting along with authority figures.  (*Id.* at 289-90).  Plaintiff described his pain as constant and highly limiting to his ability to work or perform daily activities.  (*Id.* at 290-92).

### 2.    The August 19, 2011 Hearing

At the initial hearing before ALJ Grossman, Plaintiff testified that he stopped doing construction supervisory work due to the effects of his diabetes,

15

and was now unable to perform any work due to pain in his left knee, left
shoulder, back, and neck. (SSA Rec. 64). Plaintiff detailed his history of
infections, and stated that he had no energy. (*Id.* at 83-85). Plaintiff also
discussed his liver problems, and stated that he had stopped using illegal
drugs decades earlier, and had stopped drinking five years earlier when he first
discovered his liver problems. (*Id.* at 86-87). Mentally, Plaintiff testified that
he was depressed and quick to anger; his depression stemmed in part from the
removal of his testicle, and in part from his separation from his wife caused by
his inability to work. (*Id.* at 75, 77-81). Physically, Plaintiff testified that he
could lift up to two gallons of milk with his right hand, and nothing with his
left; that he could sit for "a couple of hours" at a time; and that he could walk
up to three blocks. (*Id.* at 65-67).

### 3.    The February 21, 2012 Hearing

At the supplemental hearing, Plaintiff discussed the possible re-injury of
his shoulder following his November 3, 2011 rotator cuff surgery. (SSA
Rec. 109-10). Plaintiff further discussed his left knee pain, his hepatitis C, his
high blood pressure, and his diabetes. (*Id.* at 110-13). Plaintiff testified that
he spent his days watching TV alternating between sitting and lying down while
his mother and father took care of household chores. (*Id.* at 113-15). Dr.
Goldman then gave his evaluation of Plaintiff based upon Plaintiff's medical
records. (*Id.* at 117-39).

16

### 4.     The ALJ's Decision[10]

ALJ Grossman, considering the Plaintiff's amended request for SSI and DIB beginning December 31, 2008, issued a partially favorable ruling.  (SSA Rec. 33-50).  The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act, and that he had not engaged in substantial gainful activity since at least December 31, 2008.  (*Id.* at 37).  He next determined that Plaintiff suffered from a number of severe impairments lasting more than 12 months: diabetes mellitus, high blood pressure, hepatitis C with possible cirrhosis of the liver, problems with his left rotator cuff, suspected arthritis of the left knee, depressive disorder, and panic/anxiety disorder.  (*Id.*).

---

[10]    The SSA employs a five-step analysis for evaluating disability claims.  *See* 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled[.]"); *id.* § 416.920(a)(1) (same).  The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [him per se] disabled. ... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

ALJ Grossman then found that Plaintiff did not have an impairment or combination of impairments sufficiently severe to render him disabled regardless of age, education, or work experience. (SSA Rec. 37-39). He determined that Plaintiff was impaired only in one arm, and that his left knee problems had not resulted in a demonstrated inability to ambulate. (*Id.* at 37). Plaintiff's high blood pressure, hepatitis, and diabetes had not resulted in any complications that would render him disabled under the SSA's regulations. (*Id.*). The ALJ determined that Plaintiff had only mild restriction in the activities of daily living attributable to his mental issues (as opposed to his physical issues); that he had mild difficulties in social functioning; and that he had moderate difficulties in concentration, persistence, or pace, but that Plaintiff's impairment in functioning, while significant, did not qualify as a marked limitation. (*Id.* at 38). Noting in particular Plaintiff's recent visit to Florida to see his family, ALJ Grossman determined that Plaintiff's mental issues did not satisfy the criteria for disability. (*Id.* at 38-39).

ALJ Grossman concluded that Plaintiff had the residual functional capacity to perform most sedentary work. (SSA Rec. 39-47). While he found that Plaintiff's symptoms could be caused by the medical conditions detailed in the record, the ALJ found that the record did not support the claimed intensity, persistence, or limiting effect of those symptoms. (*Id.* at 40). For example, noting the absence of treatment for liver problems since 2009, the ALJ concluded that Plaintiff's hepatitis C did not require acute or ongoing treatment. (*Id.*). He further determined that Plaintiff's diabetes, since it had

18

not caused complications in over 12 months or for any continuous 12-month period before that time, did not significantly restrict Plaintiff's functional capacity.  (*Id.* at 40-41).  While Plaintiff's blood pressure was high, it had not resulted in any significant complications.  (*Id.* at 41).

With regard to Plaintiff's knee and shoulder ailments, ALJ Grossman noted an absence of significant evidence regarding the status of Plaintiff's shoulder since his surgery, and a general lack of evidence concerning Plaintiff's knee problems. (SSA Rec. 41-42).  Comparing the examinations of Plaintiff by Dr. Gonzalez and Dr. Joshi in 2010 with the examination by Dr. Corvalan in 2011, ALJ Grossman noted the absence of evidence of intervening injury or deterioration to explain Dr. Corvalan's significantly more negative evaluation. (*Id.* at 41-42).  ALJ Grossman thus found limited objective evidence of disability due to physical conditions.  (*Id.* at 43-44).

Turning to opinion evidence, ALJ Grossman significantly discounted Plaintiff's testimony due to inconsistency between his own reports of his symptoms at various points; inconsistency between his reported symptoms and the treatment he had actually received; his lack of compliance with medical care; and his lack of candor regarding his alcohol use. (SSA Rec. 43-44).  The ALJ ascribed minimal weight to the opinions of Dr. Perilli due to their conclusory nature.  (*Id.* at 44).  He ascribed significant weight to Dr. Joshi's conclusions due to their ample support from the evaluation.  (*Id.* at 45).  ALJ Grossman gave some weight, though not significant or controlling, to the conclusions of Dr. Gonzalez due to the contradictions between some of those

opinions and the objective evidence. (*Id.*).  He gave significant weight to the findings of Dr. Corvalan contained in his October 3, 2011 evaluation of Plaintiff; however, he gave minimal weight to Dr. Corvalan's October 7, 2011 questionnaire, which "[did] not bear a rational relation to his objective findings." (*Id.*at 46).  Finally, ALJ Grossman gave significant weight to the conclusions of Dr. Goldman; while he had not directly examined or treated Plaintiff, he had medical expertise and his conclusions were supported by the objective evidence. (*Id.* at 47).

Finally, examining Plaintiff's mental condition, ALJ Grossman noted the apparent contradiction between Dr. Tedoff's October 2011 examination of Plaintiff, which found comparatively mild limitations, and the opinions of Dr. Tedoff and Dr. Sharma, who both found comparatively severe limitations. (SSA Rec. 45-46).  ALJ Grossman concluded, "based on the limited treatment provided, and the limited abnormalities on Dr. Tedoff's mental status examination," that Plaintiff should be able to perform simple, repetitive tasks in the workplace. (*Id.* at 47).

ALJ Grossman, having found that Plaintiff could perform nearly the full range of unskilled sedentary work, and that his additional limitations (the inability to lift his left arm above his shoulder and his mental limitations) had insignificant effect on his ability to perform such work, determined that there were jobs in the national economy that Plaintiff could perform prior to turning 50 years old on January 15, 2012; accordingly, a finding of not disabled was

appropriate for this period.  (*Id.* at 48).[11]  However, once Plaintiff's age category

changed upon his turning 50 years old, a finding of disabled was appropriate

for the period beginning January 15, 2012.  (*Id.* at 48-49).

## D.    The Instant Litigation

Plaintiff filed his Complaint on October 15, 2013, seeking judicial review

of the denial of SSI and DIB from December 31, 2008, to January 14, 2012.

(Dkt. #1).  The Commissioner initially moved to dismiss the Complaint (Dkt.

#8), but withdrew the motion on June 5, 2014 (Dkt. #18), and filed the

Administrative Record and her Answer on June 9, 2014 (Dkt. #20, 21).  The

parties proceeded thereafter to file competing motions for judgment on the

pleadings: the Commissioner filed her motion on August 8, 2014 (Dkt. #24-25);

Plaintiff filed his cross-motion on September 4, 2014 (Dkt. #26-27); and the

Commissioner filed her opposition to Plaintiff's cross-motion on September 22,

2014 (Dkt. #28).

## DISCUSSION

Plaintiff argues for remand on two grounds.  First, he argues that the

ALJ's decision was not supported by substantial evidence, in particular

because ALJ Grossman improperly weighted the opinions offered by Plaintiff's

many treating and evaluating physicians.  Second, he argues that the ALJ

committed reversible error by failing to obtain vocational specialist testimony in

determining whether there were jobs in the national economy that Plaintiff

---

[11]    Critically, and as discussed further *infra*, ALJ Grossman made this finding based upon
the grids set out in the Medical-Vocational Rules, and not by consultation of a
vocational expert.  (SSA Rec. 48).

could perform.  The Court sets forth the applicable standards of law, and then explains why the first, but not the second, argument fails.

## A.    Applicable Law

### 1.    Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

### 2.    Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his inability "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Lewis* v. *Colvin*, 548 F. App'x 675, 677 n.3 (2d Cir. 2013) (summary order) (citing 42 U.S.C. § 1382c(a)(3)(A)); *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (citing 42 U.S.C. § 423(d)(1)(A)).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision of the

SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))); *see also id.* ("If there is substantial evidence to support the determination, it must be upheld.").  More than that, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala,* 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g)).

"'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make this determination — whether the agency's finding were supported by substantial evidence — "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences drawn from the facts.  *See, e.g.*, *Carballo ex rel. Cortes* v. *Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

24

**B.  The ALJ's Determination of Residual Functional Capacity Is Supported by Substantial Evidence**

There is no dispute that ALJ Grossman applied the correct legal standard by employing the five-step evaluation mandated under the regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(b).  The ALJ conducted a meticulous review of Plaintiff's testimony, his medical records, and the opinions of his treating and consultative physicians and psychiatrists, as well as the expert opinion of Dr. Goldman.  Plaintiff claims, however, that the ALJ improperly discounted the opinions of Dr. Gonzalez, Dr. Corvalan, and Dr. Sharma; minimized the concerns raised by Dr. Joshi; and gave improper weight to the opinions of Dr. Goldman.[12]  In each instance, the ALJ's decision was supported by substantial evidence.

Pursuant to 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion is given controlling weight to the extent it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Yet the Second Circuit has noted that "[m]yriad factors contribute to an ALJ's assessment of the treating physician's opinion, including the length and nature of the treating

---

[12]    Plaintiff does not appear to contest the ALJ's discounting of the statements of Dr. Perilli, Plaintiff's primary care physician.  As discussed *supra*, Dr. Perilli's evaluations consisted of the conclusory statements "unable to work" and a collection of disorganized and largely illegible treatment notes; further, as discussed *infra*, there is substantial evidence in the record contradicting these conclusory statements.  *See Halloran* v. *Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) ("Here, the key medical opinions submitted by Dr. Elliott to the ALJ were not particularly informative and were not consistent with those of several other medical experts.").  Accordingly, it was permissible for ALJ Grossman to determine that "[s]uch conclusory statements cannot be given controlling weight," and that "[v]iewing the record as a whole, only minimal weight can be given to Dr. Perilli."  (SSA Rec. 44).

doctor's relationship with the patient, the extent to which the medical evidence

supports the doctor's opinion, whether the doctor is a specialist, the

consistency of the opinion with the rest of the medical record, and any other

factors 'which tend to … contradict the opinion.'" *Rosier* v. *Colvin,* 586 F. App'x

756, 758 (2d Cir. 2014) (summary order) (quoting 20 C.F.R. § 404.1527(c)).

Where an opinion, of either a treating physician or another physician, is not

given controlling weight, in determining how much weight to ascribe to the

opinion an ALJ should consider: (i) the examining relationship; (ii) the

treatment relationship, including the length, nature, and extent of the

treatment relationship and the frequency of examination; (iii) the supportability

of the opinion; (iv) the consistency with the record as a whole; (v) the

physician's specialization; and (vi) any other relevant factors.  20 CFR

§ 414.1527(c).  Finally, opinions as to an ultimate finding of disability are not

given controlling weight.  *Id.* § 404.1527(d).

### 1.    The ALJ Did Not Err in Discounting Dr. Gonzalez's Opinion

Plaintiff first argues that Dr. Gonzalez's December 8, 2010 statement of

Plaintiff's physical ability to perform work-related activity should be given

controlling weight, as he was Plaintiff's treating orthopedist.  (Pl. Br. 16-17).

ALJ Grossman found Dr. Gonzalez's opinions regarding the limitations on

Plaintiff's left shoulder to be well supported.  (SSA Rec. 45).  However, he

discounted as unreasonable Dr. Gonzalez's opinion that, due to osteoarthritis

of the left knee, Plaintiff could walk no more than three blocks without a cane.

(*Id.*).  ALJ Grossman stated that there was "no objective documentation of

'osteoarthritis' in the left knee," and that, based upon Dr. Joshi's findings, any abnormality in gait and requirement of a cane were likely temporary and due to Plaintiff's recent testicular surgery.  (*Id.*).  Plaintiff responds that there is evidence of his experiencing left knee pain as early as April 2010, and that he reported left knee pain to Dr. Gonzalez on at least two prior occasions.  (Pl. Br. 17).

Plaintiff is correct that there were other diagnoses of arthritis in his left knee, including by Montefiore in April 2010 and by Dr. Joshi in September 2010.  (SSA Rec. 373-74, 589).  Yet ALJ Grossman was not incorrect to point to the lack of "objective evidence" supporting Dr. Gonzalez's diagnosis of arthritis and evaluation of inability to walk more than three blocks without a cane.  Dr. Goldman, reviewing the record, pointed out, "I don't have an MRI, I don't have a CAT scan. ... I don't even have a good orthopedic evaluation of his knee."  (*Id.* at 130).  Dr. Goldman's conclusions thus both supply conflicting substantial evidence and cast doubt upon the extent to which Dr. Gonzalez's diagnosis was well supported by medically accepted diagnostic techniques.  Accordingly, there was a substantial basis for ALJ Grossman to discount in part Dr. Gonzalez's findings with regard to Plaintiff's left knee.

### 3. The ALJ Did Not Mischaracterize the Findings of Dr. Joshi

Plaintiff also suggests that ALJ Grossman mischaracterized Dr. Joshi's findings by "claiming that they were temporary and related to plaintiff's recent surgery." (Pl. Br. 18).  Yet the ALJ correctly characterized Dr. Joshi's recommendation of limited activity as framed in temporary terms.  (*See* SSA

27

Rec. 589 ("In light of his recent surgery he should avoid strenuous
exertion...."")).  ALJ Grossman went on to note that, despite the relatively early
date of the examination (September 2010), there was little objective evidence to
suggest deterioration since that date.  (*Id.* at 45).  Plaintiff responds that this
statement ignores Plaintiff's subsequent rotator cuff surgery, yet the ALJ
unquestionably took such developments into account when finalizing his
conclusions as to residual functional capacity.  (*See id.* at 47 ("Limitations on
lifting the non-dominant left upper extremity above the shoulder are
reasonable, given the claimant's testimony and the medical evidence.")).  In
short, there is little in the record to suggest that the ALJ misunderstood or
mischaracterized the import of Dr. Joshi's findings, or that he erred in giving
his opinions "significant weight."  (*Id.* at 45).

### 4. The ALJ Did Not Err in Discounting the Opinions of Dr. Corvalan

As discussed *supra*, Dr. Corvalan concluded following his October 3,
2011 evaluation of Plaintiff that Plaintiff had moderate limitations for reaching
and lifting due to pain in his left shoulder, and moderate limitations for sitting,
standing, walking long distances, bending, squatting, climbing stairs, and
lifting heavy objects due to pain in his left knee.  (SSA Rec. 867).  He noted no
limitations whatsoever in Plaintiff's right arm or leg; rather, he found full range
of motion, strength, reflexes, and dexterity in both right extremities.  (*Id.* at
866-67).  Yet in completing a questionnaire four days later, Dr. Corvalan
determined that Plaintiff could *never* use *either* hand to reach, handle, finger,
feel, push, or pull, and could never operate any foot control with his right foot.

(*Id.* at 869-74).  Even if Plaintiff were correct that Dr. Corvalan used "moderate limitation" to mean complete inability to use, it would still be impossible to reconcile Dr. Corvalan's evaluations of Plaintiff's right arm and leg on October 3 with his questionnaire answers on October 7.  ALJ Grossman therefore did not err in finding that "the conclusions in this second report from Dr. Corvalan do not bear a rational relation to his objective findings," and discounting his opinions — including his opinion that Plaintiff would need to spend over six hours of an eight-hour workday lying down.  (*Id.* at 46).

### 5.    The ALJ Did Not Err in Discounting the Opinions of Dr. Sharma

Dr. Sharma was Plaintiff's treating psychiatrist, and produced two opinions: a December 3, 2010 medical source statement declaring Plaintiff markedly limited in nearly all functional areas, and a January 13, 2012 assessment evaluating Plaintiff's GAF at 48.  (SSA Rec. 698-99, 897-902).  ALJ Grossman found that Dr. Sharma's opinions were "entitled only to minimal weight, because they [were] not supported by the objective evidence as a whole"; he pointed specifically to the disconnect between Dr. Sharma's office visit notes and his opinions, and between those opinions and Dr. Tedoff's objective findings.  (*Id.* at 45).[13]  Indeed, on November 15, 2010, Dr. Sharma evaluated Plaintiff's attitude as cooperative; his affect as constricted; his mood

---

[13]    ALJ Grossman also did not mischaracterize Dr. Tedoff's findings; while his opinion was similarly negative, his objective findings were vague and mixed, leading the ALJ to ascribe to his opinions "some weight, but not significant weight." (SSA Rec. 46). Nevertheless, it is clear that several of Dr. Tedoff's objective findings, while relatively consistent with Dr. Sharma's objective findings, stand in similarly sharp contradiction to Dr. Sharma's opinions.

as depressed; his speech and comprehension as coherent and appropriate; his psychomotor activity as normal; his thought process and content as intact without hallucinations; his self-perception as unimpaired; his attention as alert; his mental orientation normal as to time, place, and person; his memory as intact; his concentration and ability to perform serial sevens as intact; his judgment as intact; and his insight and impulse control as minimally impaired. (*Id.* at 689-90). It is quite difficult to see how, less than three weeks later and with no intervening trauma, Plaintiff's ability to make judgments on simple decisions, for example, became so markedly impaired. Similarly, Dr. Sharma's November 15 finding of Plaintiff's cooperative attitude and his coherent and appropriate speech and comprehension had, by December 3, been transformed into a marked limitation in his ability to interact appropriately with coworkers.[14]

The disconnect between the opinion of Dr. Sharma and the objective findings of both Dr. Sharma and Dr. Tedoff is even more significant with regard to the January 13, 2012 report. Without any corresponding deterioration evident in either psychiatrist's notes, Plaintiff seemingly lost virtually all ability to function independently, cogitate, or interact with anyone. (*See* SSA

---

[14]    The December 3, 2010 questionnaire itself reveals a lack of care on the part of Dr. Sharma. In multiple places Dr. Sharma left blank the space where the questionnaire instructed the evaluating physician to "[i]dentify the factors ... that support your assessment." (SSA Rec. 698-99). In addition, Dr. Sharma checked "no" when asked whether Plaintiff's ability to interact appropriately with supervisors, coworkers, and the public at large was affected by impairment, but went on to note varying degrees of impairment in specific categories despite being told to go to the next question if answering "no." (*Id.* at 699).

Rec. 900-01).  Because Dr. Sharma's opinions were not consistent with the other substantial evidence in the case record, ALJ Grossman did not err in ascribing to them "only minimal weight."  (*Id.* at 45).

### 6. The ALJ Did Not Err in Placing Significant Weight upon the Opinions of Dr. Goldman

Conversely, Plaintiff objects to the ALJ's weighing of Dr. Goldman's opinions more heavily than those of several of Plaintiff's treating physicians. Plaintiff's objection is largely based upon Dr. Goldman's never having personally evaluated Plaintiff, and his testifying by phone.  (Pl. Br. 15, 21).  Yet the SSA's regulations allow an ALJ to "ask for and consider opinions from medical experts," and to determine the weight accorded to those opinions using the same criteria as for treating physicians.  *See* 20 C.F.R. § 404.1527(e)(2)(iii). Moreover, the Second Circuit has acknowledged that these regulations allow such opinions to override treating physicians' opinions where the former are supported by evidence in the record.  *See Diaz*, 59 F.3d at 313 n.5.  The Court identifies no error in ALJ Grossman's decision, after noting Dr. Goldman's expertise and the consistency of his opinions with the objective record evidence, to place significant weight on his opinions.

### C. The ALJ Erred in Declining to Obtain Vocational Specialist Testimony

"Because [Plaintiff] established that his various impairments prevented him from performing his past work, the ALJ had the burden of proving that Roma retained 'a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'"  *Roma* v. *Astrue*, 468 F.

App'x 16, 20 (2d Cir. 2012) (summary order) (quoting *Bapp* v. *Bowen*, 801 F.2d 601, 604 (2d Cir. 1986)).  "The ALJ ordinarily meets this burden by utilizing the applicable medical vocational guidelines, although sole reliance on the guidelines may be inappropriate where the claimant's exertional impairments are compounded by nonexertional impairments." *Id.*

The Second Circuit has held that the presence of nonexertional impairments does not automatically require the testimony of a vocational expert; rather, the question is whether "a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'" *Bapp*, 802 F.2d at 605 (quoting *Blacknall* v. *Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam)); *accord Vargas* v. *Astrue*, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *13 (S.D.N.Y. July 20, 2011) (citing *Zabala* v. *Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)).  A nonexertional impairment "'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Zabala*, 595 F.3d at 411 (alteration in original) (quoting *Bapp*, 802 F.2d at 605-06).

Plaintiff argues that ALJ Grossman erred in failing to obtain the testimony of a vocational expert and instead relying on the guidelines.  (Pl. Br. 22-23).  Accepting the ALJ's findings as supported by substantial evidence, as the Court does, it is agreed by both parties that Plaintiff presented, in addition to his exertional limitations, two nonexertional limitations: "[t]he

32

restriction on lifting the non-dominant upper extremity above shoulder level," and "the restriction to simple and repetitive tasks." (SSA Rec. 48; *see also* Social Security Ruling ("SSR") 96-9P, *Titles II & XVI: Determining Capability to Do Other Work — Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work*, 1996 WL 374185, at *5 (S.S.A. July 2, 1996) (defining a nonexertional limitation as "an *impairment-caused* limitation affecting such capacities as mental abilities … [and] reaching" (emphasis in original)).  Plaintiff maintains that these nonexertional limitations "significantly limit" Plaintiff's range of work, such that reliance on the guidelines was inappropriate.  The Commissioner agrees with ALJ Grossman that "the additional limitations had little or no effect on the occupational base of unskilled sedentary work." *Id.*

Courts have repeatedly accepted reliance on the grids where ALJs found that moderate mental limitations had a limited impact on the range of unskilled sedentary work available.  *See, e.g.*, *Zabala*, 595 F.3d at 411 ("The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision.  Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical-Vocational Guidelines was permissible."); *Carattini* v. *Colvin*, No. 13 Civ. 7806 (ALC), 2015 WL 1499509, at *12 (S.D.N.Y. Mar. 31, 2015) (upholding an ALJ's determination that a plaintiff's limitation "to understanding, remembering, and carrying out simple, unskilled tasks … [had] little or no

33

effect on the occupational base of unskilled work at all exertional levels").
There thus might be substantial support for the ALJ's finding that Plaintiff
"should be able to tolerate simple, repetitive tasks on a sustained basis," and
accordingly his conclusion that Plaintiff's mental limitations did not
significantly erode the occupational base of unskilled sedentary work. (SSA
Rec. 48).

More problematic is ALJ Grossman's cursory treatment of Plaintiff's left
shoulder limitations.  Courts have upheld reliance on the grids in the presence
of physical nonexertional limitations as well.  *See, e.g.*, *Gaiser* v. *Comm'r of Soc.
Sec.*, No. 13 Civ. 8234 (HBP), 2015 WL 3536604, at *12 (S.D.N.Y. June 5, 2015)
(finding that a "plaintiff's limited ability to climb does not, *per se*, significantly
limit the range of work available to plaintiff").  Here, however, Plaintiff's
physical nonexertional limitations are more relevant to the base of sedentary
unskilled work than, as in *Gaiser*, climbing or crawling.  In fact, at least one
court in this District has found that a significant limitation in the use of the left
upper extremity requires vocational expert testimony to determine its impact
upon the sedentary unskilled occupational base.  *See Faust* v. *Astrue*, No. 06
Civ. 4577 (KMK)(LMS), 2011 WL 7145740, at *13 (S.D.N.Y. Mar. 15, 2011) ("It
is certainly within the realm of possibility, and quite likely, that due to
Plaintiff's capacity to perform work of only a one-armed nature, there are
certain 'light' jobs that Plaintiff could not perform.  It is also possible, and quite
likely, that based upon the requirements of 'sedentary work,' there are certain
'sedentary' jobs that Plaintiff could not perform, further narrowing his

34

remaining occupational base.  Although Plaintiff's remaining occupational base, as the ALJ found, may not have significantly eroded as a result of Plaintiff's limitations, the ALJ provided no explanation as to how he reached that determination, what resources he used in reaching his determination, and failed to set forth the slightest sample of jobs in the national economy that Plaintiff could perform at his capacity.  The ALJ did exhibit an understanding of Plaintiff's limitations, but the Court cannot conclude that substantial evidence exists in the ALJ's decision to support his determination as to the erosion of Plaintiff's occupational base."), *report and recommendation adopted*, 2012 WL 382959 (S.D.N.Y. Feb. 6, 2012).  While there are differences between the claimants in *Faust* and the instant case — one might plausibly suggest that a tremor is more of an impediment to fine motor skills such as typing than Plaintiff's shoulder injury — the ALJ's failure to conduct a more detailed analysis leaves the Court unable to find that substantial evidence supports his determination that the erosion of Plaintiff's occupational base was insignificant.

The Court is further unsettled by ALJ Grossman's apparent reliance on SSR 83-12 in his determination that the restriction on Plaintiff's left upper extremity would not significantly affect sedentary work, and on SSR 85-15 in determining that Plaintiff's restriction to simple and repetitive tasks would not significantly erode the sedentary unskilled base.  (SSA Rec. 48).  Courts have noted that, by their own terms, the application of SSR 83-12 and SSR 85-15 is proper only where a claimant suffers exclusively from *exertional* limitations. *See Roma*, 468 F. App'x at 20 ("SSR 85-15, descriptively titled 'The Medical-

35

Vocational Rules as a Framework for Evaluating *Solely* Nonexertional Impairments,' does not apply to a case, such as this one, in which the claimant suffers from a combination of exertional and non-exertional impairments." (emphasis in original)); *Faust*, 2011 WL 7145740, at *12 (finding that "SSR 83-12 … [is] a framework for adjudicating claims in which an individual has *only* exertional limitations" (emphasis in original)).

Courts have remanded Social Security appeals for consideration of expert vocational testimony where ALJs have improperly relied upon SSR 85-15 and failed adequately to explain the basis of their determinations as to the erosion of the occupational base.  *See, e.g.*, *Prince* v. *Colvin*, No. 13 Civ. 7666 (TPG), 2015 WL 1408411, at *21-22 (S.D.N.Y. Mar. 27, 2015).  And in *Faust* the court noted that, despite SSR 83-12's defined application to solely exertional limitations, it strongly "suggests that in cases where a person has lost the use of an upper extremity, that person 'obviously cannot perform jobs which require use of both arms or both hands.  Loss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability.'" *Faust*, 2011 WL 7145740, at *12 (quoting SSR 83-12, *Titles II & XVI: Capability to Do Other Work — The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*, 1981 WL 31253, at *4 (S.S.A. Jan. 1, 1983)).

In light of Plaintiff's substantial limitations in the use of his left arm, and his acknowledged mental limitations, there was not substantial evidence for the ALJ to determine that the effect of these nonexertional limitations on the

occupational base of sedentary unskilled work was not significant. Accordingly, it was error for ALJ Grossman not to obtain the testimony of a vocational expert.

## CONCLUSION

As noted, the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). For the reasons set forth in this Opinion, the determination of the Commissioner of Social Security is hereby REMANDED for the sole purpose of obtaining the testimony of a vocational expert on the question of whether a significant number of jobs existed in the national economy that Plaintiff could have performed prior to January 15, 2012. Plaintiff's motion for judgment on the pleadings is accordingly GRANTED to that extent, and the Commissioner's motion for judgment on the pleadings is DENIED. Because a remand order pursuant to sentence four of 42 U.S.C. § 405(g) "terminates the civil action seeking judicial review of the Secretary's final decision," *Shalala* v. *Schaefer*, 509 U.S. 292, 299 (1993) (internal alterations, quotation marks, and italics omitted), the Clerk of Court is directed to terminate the motions pending at Docket Entries 24 and 26, and to close this case.

SO ORDERED.

Dated:     July 2, 2015
           New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge